# Mechanisms for Funding Intelligence Centers

Agencies may use the Economy Act to pay for facilities and services provided by the Terrorist Threat Integration Center and the Terrorist Screening Center.

It is within the reasonable discretion of fiscal officers to compute the "actual cost" to be charged for those facilities and services.

March 19, 2004

MEMORANDUM OPINION FOR THE LEGAL ADVISER
DEPARTMENT OF STATE

You have asked for our opinion about the legality of certain mechanisms for funding two intelligence centers—the Terrorist Threat Integration Center ("TTIC") and the Terrorist Screening Center ("TSC"). Letter for Jack L. Goldsmith III, Assistant Attorney General, Office of Legal Counsel, from William H. Taft, IV, Legal Adviser, Department of State (Dec. 12, 2003) ("State Letter"). We believe that it would be lawful for the agencies taking part in these centers to make payments reflecting the services and other benefits that the centers provide to them. We further believe that the precise formulas for computing the payments from each agency are, as a legal matter, left to the reasonable discretion of fiscal officers.

## I.

Both TTIC and TSC are designed to bring together employees from various agencies of the government and to combine and organize the intelligence gathered by those agencies, so that it can best be used against the threats posed by terrorists. TTIC is "an interagency joint venture that . . . integrate[s] and analyze[s] terrorist threat-related information, collected domestically or abroad, and disseminate[s] such information to appropriate recipients." Director of Central Intelligence Directive 2/4, *Terrorist Threat Integration Center* at 1 (May 14, 2003) ("DCID 2/4"). It was created through the Director of Central Intelligence's DCID 2/4, at "the direction of the President, as articulated in his State of the Union Address on 28 January 2003" and elsewhere. *Id.* TTIC is housed at the Central Intelligence Agency ("CIA") and is overseen by the Director of Central Intelligence, as head of the intelligence community. *Id.* at 2; State Letter at 1. The members of TTIC include the CIA, Department of State, Department of Justice/Federal Bureau of Investigation ("FBI"), Department of Homeland Security, and various intelligence entities of the Department of Defense. DCID 2/4, at 2.

The President provided for TSC in Homeland Security Presidential Directive 6, *Integration and Use of Screening Information* (Sept. 16, 2003) ("HSPD-6"). HSPD-6 ordered the Attorney General to create TSC "to consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful

use of Terrorist Information in screening processes." *Id.* TSC is to maintain a database related to terrorism and to respond to inquiries from federal, state and local, and foreign governments and possibly from private entities. State Letter at 2. The agencies involved in operating this joint venture, which is housed at the FBI, include the Department of State, Department of Justice/FBI, and Department of Homeland Security. *Id.*

As we understand the arrangements for funding in the current fiscal year, "all agencies that are assigning staff and relocating relevant operations to the two projects [would] pay a share of the costs based on the proportion of staff being assigned." State Letter at 2. The funds for TTIC would go to the Director of Central Intelligence's Community Management Staff; for TSC, the funds would go to the FBI. *Id.* You have asked whether these funding arrangements are lawful. In particular, you have asked whether the Economy Act, 31 U.S.C. § 1535 (2000), which allows agencies to purchase goods and services from other agencies, would authorize the arrangements or whether they would conflict with an appropriations rider forbidding the use of any appropriation for "interagency financing of boards (except Federal Executive Boards), commissions, councils, committees, or similar groups (whether or not they are interagency entities)," unless the interagency entities have "prior and specific statutory approval to receive financial support from more than one agency or instrumentality." Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 610, 118 Stat. 3, 351. You have also asked whether, assuming the Economy Act may be used, the formulas for allocating the costs here would be lawful. State Letter at 2.

The Justice Management Division submitted a memorandum arguing that the funding arrangements, including the allocation formulas, comply with the law. Memorandum for M. Edward Whelan III, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Stuart Frisch, General Counsel, Justice Management Division, *Re: Interagency Funding of the Terrorist Threat Integration Center and the Terrorist Screening Center* (Jan. 23, 2004) ("JMD Memorandum"). The Office of Management and Budget endorsed the JMD Memorandum. Letter for M. Edward Whelan III, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Jennifer G. Newstead, General Counsel, Office of Management and Budget (Feb. 20, 2004).

## II.

At both TTIC and TSC, the host agency provides goods and services to the other participating agencies so that those agencies can carry out their own functions more effectively. Each center provides a location where employees of the agencies can exchange and organize information. The centers offer physical infrastructure, such as office space and computers. They also offer such services as access to databases that pool information supplied by the various agencies and other sources. JMD Memorandum at 3–4. Under the contemplated arrangements,

participating agencies would pay for these goods and services under the Economy Act.

The Economy Act provides that the head of one agency "may place an order with . . . another agency for goods or services" if

> (1) amounts are available;

> (2) the head of the ordering agency . . . decides the order is in the best interest of the United States Government;

> (3) the agency . . . to fill the order is able to provide or get by contract the ordered goods or services; and

> (4) the head of the agency decides ordered goods or services cannot be provided by contract as conveniently or cheaply by a commercial enterprise.

31 U.S.C. § 1535(a). The amount to be paid must be the "actual cost of goods or services provided." *Id.* § 1535(b). Payment may be made in advance, with "proper adjustment" later to meet the "actual cost" requirement. *Id.*

As long as the participating agencies pay the "actual cost of goods or services provided," a subject we discuss below, these requirements of the Economy Act would be met. Because participating agencies use TTIC and TSC to carry out their own functions, the agencies' appropriations may be spent on the goods and services that the centers provide, *see* 31 U.S.C. § 1301(a) (2000) (appropriations may "be applied only to the objects for which the appropriations were made"), and their funds are thus "available" under 31 U.S.C. § 1535(a)(1), as long as the amounts of those funds remain sufficient. The President has determined that the operations of TTIC and TSC are important for protecting the nation against terrorists, and the head of a participating agency thus could "decide[] the order [for goods and services] is in the best interest of the United States Government," as required by 31 U.S.C. § 1535(a)(2). The CIA and FBI are able to provide these goods and services. *Id.* § 1535(a)(3). And the heads of participating agencies could reasonably determine, under 31 U.S.C. § 1535(a)(4), that no commercial enterprise could offer the same services as "conveniently" or perhaps even at all.

As shown by the Comptroller General's opinion in *To the Secretary of Commerce*, 38 Comp. Gen. 36 (1958),[1] the Executive Branch has before put in place somewhat similar arrangements under the Economy Act. There, the Comptroller General concluded that the Weather Bureau could not allow a private company to

---

[1] "The opinions and legal interpretations of the General Accounting Office and the Comptroller General often provide helpful guidance on appropriations matters and related issues" but "are not binding upon departments, agencies, or officers of the Executive Branch." *Applicability of Government Corporation Control Act to "Gain Sharing Benefit" Agreement*, 24 Op. O.L.C. 212, 216 n.3 (2000) (citing *Bowsher v. Synar*, 478 U.S. 714, 727–32 (1986)).

connect with a natural gas line that the Weather Bureau maintained. In explaining one ground for this decision, the Comptroller General wrote "that the funds used for construction of the natural gas line and distribution system were advanced to the Weather Bureau by the several agencies to be benefited from the facilities under section 601 of the Economy Act of 1932." 38 Comp. Gen. at 38 (citations omitted). Therefore, he reasoned, "such facilities must be regarded as property under the control of those agencies on a pro rata basis even though presently in the custody of the Weather Bureau under the involved arrangement," and the Weather Bureau therefore could not "limit, restrict, reduce, abridge, or encumber in any manner the pro rata interests of the other agencies in the facilities." *Id.* (citations omitted). Although the Comptroller General did not directly address the legality of the agency payments under the Economy Act, he appears to have assumed the legality of those arrangements by concluding that the various agencies had acquired interests that the Weather Bureau could not lawfully abridge. Similarly, the agencies taking part in TTIC and TSC would be paying for joint facilities they have the right to use, as well as for services of mutual benefit. The JMD Memorandum argues that they may even acquire the same sort of property interests as recognized in the Comptroller General's decision. *Id.* at 11. In any event, the Economy Act would permit the arrangements.

The Economy Act requires that an ordering agency pay only the "actual cost" of the ordered goods or services. 31 U.S.C. § 1535(b). Payment under the Economy Act must ensure that "the performing agency is reimbursed for its costs," *Letter for David P. Holmes, Acting General Counsel, Central Intelligence Agency*, B-250,377, 1993 WL 35613, at *2 (Comp. Gen. Jan. 28), but "any retention of amounts in excess of actual costs . . . would result in an improper augmentation of the [performing agency's] appropriations," *In re Bureau of Land Management—Disposition of Water Resources Council Appropriations Advanced Pursuant to the Economy Act*, 72 Comp. Gen. 120, 122 (1993) (citation omitted). The assignment of costs requires an element of judgment. "While the Economy Act requires recovery of 'actual costs,' . . . the term has a flexible meaning and recognizes distinctions or differences in the nature of the performing agency, and the purposes or goals intended to be accomplished." *In re Washington National Airport; Federal Aviation Administration; Intra-Agency Reimbursements Under 31 U.S.C. 686 (1970)*, 57 Comp. Gen. 674, 685 (1978). The question of cost computation is "one primarily for administrative consideration, to be determined by agreement between the agencies concerned." *Reimbursement for Interagency Services*, 22 Comp. Gen. 74, 78 (1942).

You have raised questions about two particular aspects of the cost allocation formulas for TTIC and TSC: first, the allocation of costs according to the number of employees that each agency situates at TTIC or TSC; and, second, the inclusion in the assigned costs during a single year of capital expenditures for facilities to be used over a number of years. State Letter at 3–6. The JMD Memorandum suggests a rationale for each of these elements in the cost formula. As to the assignment of

costs per capita, the JMD Memorandum argues that "[w]ith respect to operations such as TTIC and TSC, where unit pricing of outputs is not realistic, per capita and similar approaches are widely used and embraced by accountants and auditors alike." *Id.* at 9. The JMD Memorandum also contends that the number of employees assigned to each center is a reasonably accurate basis for estimating the costs of providing facilities and equipment for these employees and for estimating the "interest" (and, we take it, the demands) of the agency with respect to overhead resources. *Id.* at 10. As to capital expenditures, the JMD Memorandum argues that the "actual costs" are whatever the host agency pays in a particular year and that the State Department would obtain an ownership interest in the capital resources commensurate with its cost allocation. *Id.* at 11. We do not need to resolve these issues. At least as long as a cost assignment method is reasonable, we believe that the fiscal experts are free to use or reject it: "As long as the amount agreed upon [by the agencies] results from a bona fide attempt to determine the actual cost and, in fact, reasonably approximates the actual cost," there should be "no objection to payment in the amount agreed upon." *To Mr. Neal J. Price, Authorized Certifying Officer, International Cooperation Administration*, B-133,913, 1958 WL 2065, at *1 (Comp. Gen. Jan. 21). We believe that the methods to be used here would rest on "a bona fide attempt to determine the actual cost" and would be reasonable.

## III.

We also believe that the proposed arrangements would not violate the bar against "interagency financing" in section 610 of the Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3, 351:

> No part of any appropriation contained in this or any other Act shall be available for interagency financing of boards (except Federal Executive Boards), commissions, councils, committees, or similar groups (whether or not they are interagency entities) which do not have a prior and specific statutory approval to receive financial support from more than one agency or instrumentality.

We believe that this appropriations rider would not bar transactions under the Economy Act in connection with an intelligence center, staffed by employees of several agencies, that supplies goods and services that the constituent agencies use. To the extent that agencies would pay an intelligence center for goods and services, they would not "financ[e]" the center. In the ordinary meaning of the word, consumers do not "finance" a seller when they buy its products or services. *See Webster's Third New International Dictionary* 851 (1993) (examples of use of term meaning "to raise or provide funds or capital for" include no instances of a consumer's providing funds through a purchase). Moreover, even if orders under the Economy Act could be said to provide "interagency financing," the Economy Act is a "prior and specific statutory approval to receive financial support from

more than one agency or instrumentality" within the meaning of this provision. While the Economy Act does not "specific[ally]" address interagency groups as a class, let alone any particular group, it does set up a mechanism by which a single agency may supply goods and services to several other agencies.

We note that this interpretation accords with decisions of the Comptroller General. Shortly after Congress first enacted riders on interagency financing in 1969, the Comptroller General considered application of such a rider to the Interagency Institutes for Federal Hospital Administrators. *To the Administrator, Veterans Administration*, 49 Comp. Gen. 305 (1969). The Veterans Administration had contracted for the services of a director of this interagency venture, and the agency members then shared the costs of the contract. The Comptroller General found that the arrangement violated the rider, but he did not rule that the Economy Act would be unavailable for the purchase of goods or services from an interagency entity. Instead, he pointed to a peculiarity of the Economy Act at the time. Under the version then in effect, the Economy Act specifically named those agencies that could obtain goods or services from a supplying agency that contracted for goods or services from an outside seller, rather than providing them directly. One of the agencies involved in the particular case was not named in the statute and thus lacked the necessary authority to obtain goods and services that the supplying agency had obtained by contract:

> Concerning the use of the authority contained in section 601 of the Economy Act as a basis for the proposed arrangement, we note that that section permits only certain enumerated agencies to place orders with other agencies for services which the latter agencies may be in a position to procure by contract. Since the Department of Health, Education, and Welfare is not one of the enumerated agencies, [the Veterans Administration] may not obtain any services by that contract for that department under the authority of [the Economy Act].

49 Comp. Gen. at 307 (citation omitted). Accordingly, the Economy Act was unavailable because its terms had not been met, not because the rider precluded its use.

In a later opinion, the Comptroller General wrote that "[g]enerally, the restriction [against interagency financing] prohibits agencies from making voluntary contributions or payments in support of interagency ventures." *In the Matter of U.S. Equal Employment Opportunity Commission—Reimbursement of Registration Fees for Federal Executive Board Training Seminar*, 71 Comp. Gen. 120, 121 (1991) (citation omitted). Accordingly, he concluded that the restriction

> does not . . . prohibit an agency from paying a registration fee to permit an employee to attend a Federal Executive Board sponsored EEO training seminar if, as is the case here, the fee appears to reasonably and accurately reflect the cost incurred by the Board for the

employee to attend the seminar. So long as the payment of such a fee directly benefits the agency making the payment and the fee does not include an element designed to capture more than the costs of sponsoring the seminar, we would not view the expenditures at hand as interagency financing.

*Id.* at 121–22 (citation omitted). This analysis largely tracks ours here. While the appropriations rider bars agencies, in the Comptroller General's phrase, from making "voluntary contributions or payments in support of interagency ventures," it does not forbid otherwise lawful transactions in which agencies pay for the costs of goods or services that they receive from interagency groups. *See also In the Matter of Career Service Awards Program*, 70 Comp. Gen. 16, 17 n.3 (1990).[2]

This interpretation is not undermined by the treatment of other appropriations riders in the Consolidated Appropriations Act that refer to the ban against interagency financing. These riders state that "notwithstanding . . . section 610," funds "shall be available for interagency funding" of specific ventures, or they use similar formulations.[3] If the funding arrangements under these provisions necessarily involved cost-based transactions under the Economy Act in which several agencies paid, it might be argued that the separate exceptions were necessary to overcome the bar on "interagency financing" under section 610 and that the Economy Act therefore did not constitute "a prior and specific statutory approval to receive financial support from more than one agency or instrumentality" within the meaning of section 610. However, the Office of Management and Budget informs us that, so far as it is aware, the allocation of costs to agencies under these provisions is not based on actual cost of goods or services supplied. For example, the funding for interagency councils under section 627 comes from contributions

---

[2] In another opinion, the Comptroller General disputed the use of a cost allocation method that "does not necessarily relate" to the goods and services actually provided and "do[es] not identify what goods or services each participant actually receives." *In re Invoice to IRS for That Agency's Share of CFC Solicitation Expenses Incurred in Northern Utah in 1985*, 67 Comp. Gen. 254, 258 (1988). The State Letter observes that the opinion first found the rider to forbid the arrangement in question and then concluded that "[e]ven if one could successfully argue that this restriction did not apply to the voucher in question, payment on this voucher would still have to satisfy" the restrictions of the Economy Act and the other statutory restrictions on the transfer of funds. *CFC Solicitation Expenses*, 67 Comp. Gen. at 257. As the State Department reads the opinion, "the Comptroller General . . . discusses the Economy Act, but only as imposing additional requirements that would have to be satisfied, if the prohibition on inter-agency funding did not apply." State Letter at 2. We believe that the Comptroller General's later opinion on fees for equal employment opportunity training, discussed in text, more accurately states the governing legal principles.

[3] Section 615 covers certain "national security and emergency preparedness telecommunications initiatives"; section 626 deals with the Joint Financial Management Improvement Program; section 627 concerns the Policy and Citizen Services account at the General Services Administration; section 630 applies to "specific projects, workshops, studies, and similar efforts to carry out the purposes of the National Science and Technology Council"; and section 648 deals with the transfer of money for the operation of Midway Atoll Airfield. Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3, 353, 356, 357, 362.

under a formula according to which twenty percent of the funding is drawn from identical contributions from all twenty-four agencies involved, forty percent of the funding is based on each agency's information technology spending as a percentage of the total for the twenty-four agencies, and another forty percent is based on each agency's discretionary budgetary authority as a percentage of the total for the twenty-four agencies. The "notwithstanding" provisions in the statute thus permit funding arrangements that otherwise would constitute "interagency financing" as we have interpreted that term here—the payment of contributions that do not reflect actual costs. In any event, even if the funding arrangements under some or all of these provisions did necessarily involve cost-based transactions under the Economy Act in which several agencies paid, we do not believe that this fact would overcome the other arguments establishing that use of the Economy Act in cost-based transactions is not "interagency financing."[4]

We therefore conclude that agencies may use the Economy Act to pay for facilities and services offered by TTIC and TSC and that it is within the reasonable discretion of fiscal officers to compute the "actual cost" to be charged for those facilities and services.

M. EDWARD WHELAN III
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[4] We do not believe that the authority under section 648, which concerns the Midway Atoll Airfield, is being used at all. We understand that the Department of Transportation has used the Economy Act to place an order with the Department of Interior for operation of the facility. In this instance, the agencies did not use the authority in section 648 to engage in "interagency financing" under any plausible understanding of the term, because only one agency bore the entire cost. The arrangement, therefore, does not illuminate what the bar on "interagency financing" might mean.